# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
:
LUCICA ICLEANU,                          :          CIVIL ACTION
                                         :
            Plaintiff,                   :
                                         :
      v.                                 :          No. 06-2812
                                         :
AMERICAN BAPTIST CHURCHES USA,           :
                                         :
            Defendant.                   :
_____:

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                          **AUGUST 28, 2007**

Plaintiff Lucica Icleanu ("Icleanu"), an American citizen of Romanian birth, has filed suit against her former employer, Defendant American Baptist Churches USA ("ABC"), alleging that she suffered disparate treatment, retaliation, and harassment because of her heritage in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951, et seq.  Presently before this Court is ABC's Motion for Summary Judgment, which is granted for the following reasons.

## I.   BACKGROUND

Icleanu was born and educated in Romania.  She and her husband emigrated to the United States in 1991.  In March 2001, she applied for a position as an accounts payable accounting specialist at ABC after she learned about the job through a newspaper advertisement.  Icleanu was hired, and she began working for the company on May 1, 2001.  She worked in that position for the duration of her employment with ABC.  While ultimately terminated from ABC, Icleanu does not allege that her termination was unlawful under applicable laws.  The events that form

the basis of Icleanu's Complaint all occurred while she was employed by ABC.

Icleanu was an hourly employee in ABC's accounting department.  The department consisted of two parts, the general fund accounting group and mission fund accounting group.  The general fund group handled all payroll functions, and was comprised of Icleanu and her supervisor Kindra Sloan.  The mission fund group handled the monthly contributions sent to ABC by its member churches, and was composed of Joyce Rothenberger and her supervisor Barbara Jarrett.  The bulk of Icleanu's responsibilities were general fund tasks, but her position required her to perform some tasks for the mission fund as well.  Icleanu was responsible for processing the daily lockbox packages that the mission fund group received from the bank, a task which required that she verify figures and mail receipts.  Members churches mailed contributions to ABC monthly.  ABC assigned the task of opening the mail and depositing the checks to its bank.  When the bank was finished, it sent photocopies of the checks to ABC in the lockbox package.  The package also included confirmation receipts, which each church provided with their contribution.  When the paperwork was received by ABC, it needed to be sorted and reconciled, and the receipts needed to be mailed to the contributor churches.  It was Icleanu's responsibility to verify that the amount deposited matched the copies of the checks, enter the figures onto a spreadsheet, and mail out the confirmation receipts.  The spreadsheet was then used by Joyce Rothenberger, who entered the figures into the system.

In 2003, Michaele Birdsall, assistant treasurer and supervisor for all four woman above, received complaints from Rothenberger and Jarrett that Icleanu was not processing the lockbox packages in a timely manner.  They said Icleanu's delays were hindering their ability to do their work.  A schedule was then created for the lockbox packages which Icleanu was instructed to

2

follow.  Birdsall was replaced in April 2004 by Alan Musoke, a native of Uganda.  Musoke also received complaints from Rothenberger and Jarrett about Icleanu's timeliness in processing the lockbox packages.

Musoke held a meeting on November 30, 2004, to address the issues with Icleanu's performance.  He implemented a new schedule which required that Icleanu process mission receipts on Mondays, Tuesdays, and Fridays.  On that same day as that meeting, or possibly the next day, December 1, 2004, Icleanu complained to Musoke that Jarrett and Rothenberger engaged in an inappropriate conversation about immigrants after the presidential election on November 2, 2004.  Icleanu said she overheard them speaking negatively about immigrants, and was affected by their comments as she felt they were directed towards her.  According to Icleanu, Jarrett and Rothenberger were talking about their disappointment that President Bush had been reelected.  Icleanu turned around from her desk, and saw them pointing at her and saying that the reason Americans do not have enough jobs is because President Bush brings immigrants to the United States.  Musoke advised Jarrett and Rothenberger of the complaint and also contacted human resources.  A meeting was held at which Rothenberger and Jarrett were informed that comments like that would not be tolerated.  This is the only comment Icleanu claims was ever made in regard to immigrants.

Icleanu was dissatisfied with this resolution.  On December 23, 2004, she requested a meeting with C. Jeffrey Woods, Ph.D, the affirmative action officer for ABC.  As the affirmative action officer, it was Woods' job to help the staff members resolve issues with their supervisors. Woods met with Icleanu in January, 2005.  After their meeting, he emailed Icleanu a summation of their conversation, and informed her of the additional steps she could take if she was still

3

displeased.  He quoted ABC's staff grievance policy which stated that "[i]t is expected that both staff and supervisors will make every reasonable effort to resolve any problem informally . . . [but] [i]f a grievance is not settled through informal discussion, an employee may follow [a] formal grievance procedure[.]"  (Def.'s Mot. Summ J. Ex. D, Icleanu Dep. Ex. 11 at section 701.)  Icleanu did not proceed with the formal procedure at that time.

Icleanu alleges that various retaliatory actions befell her after she complained about her coworkers.  In February of 2005, Icleanu was told that she needed to swipe her access card to the building upon entry and exit.  Cheryl Wade, treasurer for ABC and Musoke's supervisor, had observed Icleanu arriving late to work on more than one occasion, and was concerned that Icleanu was not putting in her required hours, as she was an hourly employee.  Wade informed Musoke of her concern and instructed him to monitor Icleanu to ensure that she was working the full duration of her shift.  Wade stated that she wanted Icleanu to use her access card so that there would be a record of when she arrived and left.  Prior to this, Icleanu had been entering the building through an alternate entrance, which did not require that she swipe her card, and getting to her desk from a back way through the building.  ABC's general policy was to require its employees use access cards to gain entry into the building.  That policy did not require employees to use their access cards to exit.  Icleanu was the only hourly employee in the accounting department.

On July 25, 2005, ABC imposed a requirement on Icleanu that she must submit a doctor's note after every sick day she took.  Earlier in the year, Wade had become concerned with the amount of sick time that Icleanu had used.  In reviewing the number of days that Icleanu had taken off, it was discovered that her time sheets did not match emails Sloan, her supervisor, had

sent regarding Icleanu's her absences for illness.  ABC had also received complaints from various churches who had not been receiving their confirmation receipts promptly.  In light of the fact that Icleanu was out sick frequently and her tasks were not being completed, Wade requested that Icleanu provide a doctor's note after each sick day she took in accord with personnel policy 403.  Icleanu protested this imposition, but was informed by Wendy Rothenberger[1] of the human resources department that pursuant to ABC's handbook she could be required to submit doctor's notes.  Wade had previously imposed this requirement on two other employees.  Icleanu provided a doctor's note after each sick day she took subsequent to July 2005.

On August 4, 2005, Icleanu sent an email to Sloan, Musoke, and Woods complaining about being treated poorly by Joyce Rothenberger and Jarrett.  Icleanu stated that these women had been talking negatively about her and questioning her about what she did all day.  After this episode, Wendy Rothenberger held a meeting to discuss the interpersonal conflicts that existed between the members of the general and mission fund groups.  The facts show that Icleanu and Joyce Rothenberger had complained about each other frequently over the course of Icleanu's employment.  These women had a very poor working relationship.  They spied on each other, and fought over the littlest of things.  They even had an ongoing feud over a door to a storage closet, i.e. when it could be open and by how much.  However, most of the instances presented are not germane to this national origin discrimination claim and will not be recited in detail.  At the meeting, Wendy Rothenberger told the women that they needed to stop talking about each other while they were at work.

Following the meeting, Icleanu emailed Woods again on August 9, 2005, about the

---

[1] Wendy Rothenberger is the daughter of Joyce Rothenberger.

problems she was having with Joyce Rothenberger and Jarrett.  She wrote mostly about being insulted and treated poorly, but included the following line, "I am even paid less than the other probably because I am an immigrant[.]" (Def.'s Mot. Summ. J. Ex. D, Icleanu Dep. Ex. 76.) Icleanu concluded this email by stating that if the insults and negative treatment did not stop, she was prepared to inform the board about the situation with her coworkers.  Woods' response to this email again informed Icleanu of her option to file a formal complaint with ABC in accord with the company's personnel policy.  He also wrote, "I would discourage you from contacting the General Board to express your concerns, but rather follow the options as outlined above." (Id.)  After her email, Icleanu went out on Family Medical Leave Act leave for depression until the end of August.  While on leave, she filed a complaint with the EEOC on August 19, 2005.

Icleanu celebrated her fortieth birthday on September 1, 2005.  Upon her return to work, Sloan emailed her wishing her a happy birthday.  In an email exchange, and these women discussed whether they thought that ABC would even bother celebrating birthdays that month since Icleanu's was the only one.  ABC had a practice of holding a monthly birthday celebration for employees whose birthdays fell within that month.  Icleanu stated in her email that she would not participate even if ABC did celebrate birthdays, because she did not want to receive fake wishes or cards.  ABC did not celebrate Icleanu's birthday in September, 2005.

The final incident which Icleanu complains of occurred in conjunction with her 2005 performance review.  Musoke had asked Sloan to prepare drafts of Icleanu's review and another temporary employee's review.  After reviewing the drafts, he instructed Sloan to include specific comments about Icleanu's problems with her mission fund responsibilities.  Sloan refused to do so, and presented the review to Icleanu without the comments or Musoke's approval.  She was

later cited for insubordination and removed as Icleanu's supervisor.  Musoke then took over responsibility for supervising Icleanu himself.  He corrected her review, adding comments about Icleanu's problems with her mission fund responsibilities, and he revised her overall performance rating from "exceeds expectations" to "meets expectations."  Icleanu and Sloan refused to sign the review.  Musoke continued to receive complaints about Icleanu's performance throughout the remainder of 2005 and into 2006.

Icleanu took multiple weeks of FMLA leave for depression in January and February of 2006.  On Monday, March 6, 2006, Icleanu faxed a doctor's note to ABC stating that she would be out indefinitely because of depression.  Icleanu never returned to work at ABC.  Icleanu remained employed until May 26, 2006, when she was terminated because she failed to return to work after her available FMLA leave expired.  Icleanu had been informed of this possibility by letter on May 3, 2006.  In the letter, ABC stated options available to her, and informed her that ABC was not required to hold her job open.  The company provided the name of people she should contact to discuss the matter.  Icleanu did not contact anyone at ABC.  She testified that she had not intended to return to her job.

Icleanu was issued a Notice of Right to Sue by the EEOC on March 29, 2006, stating that it was terminating its processing of her charge against ABC.  She filed the Complaint in this action on June 27, 2006, alleging two counts against ABC.  Count I states a claim for violations of Title VII, 42 U.S.C. § 2000e (2007).  Count II states a claim under the PHRA, 43 Pa. Cons. Stat. § 955 (2007).  ABC filed a Motion for Summary Judgment on May 23, 2007.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is

no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." See also Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. The non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence showing that there is a genuine factual dispute requiring a trial. Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). A genuine factual dispute exists when "a reasonable jury could return a verdict in favor of the non-moving party." Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 817 (E.D. Pa. 2005). When a party fails to establish an element of their case, summary judgment must be granted. Celotex, 477 U.S. at 322.

## III. DISCUSSION

### A. Individual disparate treatment

"The essence of disparate treatment is different treatment." Barbara Lindemann & Paul Grossman, Employment Discrimination Law 9 (3d ed. 1976). Employers are prohibited under Title VII from intentionally treating people differently because of certain characteristics they possess. The statute makes it "an unlawful employment practice . . . to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).  Actions in violation of the above federal law are similarly unlawful under the PHRA.  43 Pa. Cons. Stat. § 955(a).  Icleanu claims that because of her Romanian heritage, ABC subjected her to a different requirement regarding sick leave than any of its other employees.  She believes that the imposition of a doctor's note requirement on her absences for illness was a violation of Title VII.  Icleanu does not allege that any other action of ABC's constitutes disparate treatment.

The vital question in a disparate treatment case is always whether the defendant was motivated to act because of a discriminatory intent.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983) (plaintiff must show that the alleged unlawful action bore a discriminatory animus against her in order to establish a disparate treatment claim).  Icleanu may prove ABC's intent by presenting either direct or circumstantial evidence.  Plaintiffs frequently lack direct evidence of employment discrimination case, and may instead prove discrimination indirectly by inference.  When circumstantial evidence is used to prove intent, the action must be analyzed under the three part burden shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green,  411 U.S. 792, 802 (1973).

The framework requires the plaintiff to first establish the prima facie elements of her discrimination claim.  Id. at 802. "The burden of establishing a prima facie case of disparate treatment is not onerous."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  Showing the prima facie elements creates a rebuttable presumption of discrimination. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 330 (3d Cir. 1995).  The defendant then gets

9

a chance to rebut this presumption by articulating legitimate non-discriminatory reasons for taking the actions that it did against its employee. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 253-55. If the defendant offers a legitimate reason, the plaintiff gets an opportunity to prove by a preponderance of the evidence that the legitimate reason was not the true reason, but rather was just a pretext for discrimination. Burdine, 450 U.S. at 253.

To establish her prima facie case of disparate treatment, Icleanu must show are that she (1) is a member of a protected class, (2) was qualified for the position in question, (3) suffered an adverse employment action, and (4) the circumstances support an inference of discrimination. Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510 (2002); Abramson v. Wm. Patterson Coll. of N.J., 260 F.3d 265, 281-82 (3d Cir. 2001); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999). Icleanu was born in Romania, emigrated to the United States in 1991, and was hired by ABC in May, 2001 for a position in the accounting department. (Def.'s Mot. Summ. J. Ex. D, Icleanu Dep. at 7, 19.) Icleanu has established the first two elements of her prima facie case.

An adverse employment action, the third element, is an action by an employer that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives . . . her of employment opportunities, or adversely affects . . . her status as an employee." Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006). Section 403 of ABC's employee handbook states that:

> A doctor's release to return to work may be required after any illness of 3 days or more in duration. A doctor's release to return to work may be required after any illness resulting in any time missed from work. Your supervisor will notify you when a doctor's release is required for an illness less than three days in duration.

(Def.'s Mot. Summ. J. Ex. D, Icleanu Dep. Ex. 11.) One of the terms of Icleanu's employment was that she could be required at anytime to present a doctor's note following an absence for

illness.  The fact that the provision was not enforced until ABC deemed it necessary did not effect a change in the terms of Icleanu's employment.  Icleanu has not shown that she suffered an adverse employment action.  Other courts in this District have also held that the imposition of a doctor's note requirement is not an adverse employment action.  See Jenkins v. Phila. Hous. Auth., No. 00-609, 2001 WL 1298988 * 5 (E.D. Pa. Oct. 24, 2001).  Icleanu has not established the third element of her prima facie case.

Similarly, the circumstances surrounding the imposition of this requirement do not give rise to an inference of discrimination.  Since section 403 of the employee handbook allows ABC to impose this requirement, Icleanu argues that she was treated differently because her doctor's note requirement was accompanied by the threat of discipline.  (Pl.'s Opp. Ex. P-105.)  She would have been put on probation for the first failure to present a doctor's note after any absence for illness, and a second offense could have resulted in termination.  (Id.)  However, two other employees were previously required to present doctor's notes, and faced a similar disciplinary scheme for failure to comply.  (Def.'s Mot. Summ J. Ex. D, Icleanu Dep. at 89-91; Ex. G, W. Rothenberger Dep. at 29-30.)  And no evidence has been presented showing that these other employees, Lorie Smith and Portia George, were born outside of the United States.  These facts do not give rise to an inference of discrimination.  Quite the contrary, Icleanu has shown that she was treated similarly to other employees with regard to the doctor's note requirement.

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Icleanu has failed to establish two elements of her prima facie case, and therefore, ABC's Motion for Summary Judgment on Icleanu's claim under

42 U.S.C. § 2000e-2 must be granted.  Federal courts treat the PHRA and Title VII as embodying

identical standards.  Bianchi v. City of Phila., 183 F. Supp. 2d 726, 734 n.4 (E.D. Pa. 2002).

Therefore, disposition of the federal claim applies to the state law claim as well.  ABC must be

granted summary judgment on Icleanu's claim arising under 43 Pa. Cons. Stat. § 955.

> **B.      Retaliation**

Employers are prohibited from retaliating against employees who exercise their right to

file discrimination charges against their employer.  It is an "unlawful employment practice for an

employer to discriminate against any of his employees . . . because [s]he has opposed any

practice made an unlawful employment practice by this subchapter, or because [s]he has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Actions unlawful under the above

federal law are similarly unlawful under the PHRA.  43 Pa. Cons. Stat. § 955(d).  Icleanu claims

she was subjected to various retaliatory actions after she complained to Musoke and Woods in

2004 about the comment her coworkers made about immigrants.

"The anti-retaliation provision protects an individual not from all retaliation, but from

retaliation that produces an injury or harm."  Burlington N. and Sante Fe Ry. Co. v. White, 126

S. Ct. 2405, 2415 (2006).  "A plaintiff must show that a reasonable employee would have found

the challenged action materially adverse, which . . . means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  Id.  "It is important to

separate significant from trivial harms[,] as Title VII . . . does not set forth a general civility code

for the American workplace."  Id.  "[N]ot everything that makes an employee unhappy qualifies

as retaliation, for otherwise, minor and even trivial employment actions that an irritable,

chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."
Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997) (abrogated by Burlington N.,
126 S. Ct. at 2415 on other grounds).

Retaliation, like disparate treatment, can be shown with circumstantial evidence.  Thus,
the familiar burden shifting framework of McDonnell Douglas must be utilized in this analysis.
Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Weston v. Comm'w of Penn.,
251 F.3d 420, 430 (3d Cir. 2001).  "To establish a prima facie case of retaliation, a plaintiff must
show that: (1) she engaged in a protected employee activity; (2) the employer took an adverse
employment action after or contemporaneous with the protected activity; and (3) a causal link
exists between the protected activity and the adverse action."  Weston, 251 F.3d at 430; see also
Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

ABC does not oppose Icleanu's contention that she engaged in protected activity.  After
the 2004 presidential election, Icleanu overheard her co-workers say there was a shortage of jobs
in the United States because the President allowed immigrants to come to this country to replace
American workers.  (Def.'s Mot. Summ. J. Ex. D, Icleanu Dep. at 310-11.)  Icleanu believed
these comments were directed towards her, and sometime after the event she complained to
Sloan and Musoke.  (Id. at 311-12.)  She further complained to Woods on December 23, 2004,
stating that she thought these comments about immigrants were discriminatory.  (Def.'s Mot.
Summ. J. Ex. D, Icleanu Dep. Ex. 69.)  Therefore, Icleanu has established the first element of her
prima facie case.

Icleanu argues that ABC retaliated against her in five ways, all of which she believes are
adverse employment actions.  Those five actions were: (1) demanding in February 2005 that she

13

use her access card to enter and exit the ABC office building; (2) refusing to assign portions of her work to a volunteer employee; (3) imposing the doctor's note requirement in July 2005; (4) failing to celebrate her birthday during September 2005; and (5) including negative comments from Musoke in her 2005 performance review which was presented to her in October 2005. Failing to delegate Icleanu's work to a temporary employee, and failing to celebrate her birthday are minor and trivial and would not have dissuaded a reasonable worker from making or supporting a charge of discrimination.  These are not adverse actions.  But, the three other events might have had an impact on her compensation, thus, this Court will assume for the purposes of this Memorandum that they constitute adverse actions.  Similarly, this Court will also assume that Icleanu has established a causal link.

Because this Court assumes that Icleanu has established a prima facie case, the burden of production is shifted to ABC to present evidence of legitimate non-discriminatory reasons for its actions.  Regarding the requirement that she use her access card to enter and exit the building, this measure was imposed after Wade, who was responsible for the whole accounting group, witnessed Icleanu arriving late to work on a few occasions.  (Def.'s Mot. Summ. J. Ex. F, Wade Dep. at 34-35.)  She was an hourly employee, and Wade was concerned that she might not be working the full duration of her shift.  (Id.)  Thus, she required Icleanu to use her access card in a fashion similar to employees who must punch time cards.  ABC has presented a legitimate non-discriminatory reason for this action.

The burden is therefore shifted back to Icleanu to present evidence that ABC's reason is only a pretext for its real motivation which was her national origin.  Icleanu has offered no evidence to establish that the Defendant's reason was pretextual.  She argues that the fact that

this event occurred within three months of her complaint about her coworkers' comments suffices to establish pretext.  The Third Circuit has held that, "the mere fact that an adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events."  Robinson, 120 F.3d at 1302. Therefore, ABC must be granted summary judgment on this allegation.

Regarding the doctor's note requirement, ABC has offered that it imposed this on Icleanu because human resources discovered that she had been absent for illness more times than she reported on her time sheets.  (Def.'s Mot. Summ. J. Ex. G, W. Rothenberger Dep. Ex. 1.)  There were several instances where Sloan had sent an email noting that Icleanu was out sick, but the time sheet Icleanu submitted was marked "regular" for that day.  (Id.)  The requirement was imposed after this problem surfaced.  ABC has therefore offered a legitimate non-discriminatory reason for his action.  Icleanu has offered no evidence showing that the reason offered by ABC for this requirement was pretextual.  ABC must be granted summary judgment on this allegation.

The final action alleged to be retaliatory is the inclusion of Musoke's comments on the performance review presented to Icleanu in 2005.  ABC has presented evidence showing that Musoke included comments in an effort to provide an accurate portrait of Icleanu's performance during the preceding year.  There had been complaints about Icleanu's performance for a long time.  (Def.'s Mot. Summ. J. Ex. E, Birdsall Dep. at 16-20.)  Musoke wrote numerous emails about Icleanu's mission fund tasks not being accomplished since he took over the position from Birdsall.  (Def.'s Mot. Summ. J. Ex. D, Icleanu Dep. Ex. 93, 94, 95; Ex. G, W. Rothenberger Dep. Ex. 1.)  While Sloan disagreed with Musoke's negative assessment, she testified that she had no firsthand knowledge of Icleanu's deficiencies or how they affected the mission fund

15

group.  (Def.'s Mot. Summ. J. Ex. M, Sloan Dep. at 55.)  Musoke's comments merely stated that

Icleanu was not dependable due to her poor attendance, and that she was failing to process her

mission fund tasks.  (Def.'s Mot. Summ. J. Ex. D, Icleanu Dep. Ex. 92.)  ABC has presented a

legitimate non-discriminatory reason for its action, and the burden thus shifts back to Icleanu.

Icleanu has offered testimony from Sloan as evidence that ABC's stated reason for adding

these comments was pretextual.  Sloan testified that Musoke told her that Wade wanted her to

fire Icleanu, and that Wade believed Icleanu was a problem because of her threat to go to the

general board, which she included in her August 9, 2005 email to Woods.  (Def.'s Mot. Summ. J.

Ex. M, Sloan Dep. at 151-52.)  Musoke denied ever saying these things.  (Def.'s Mot. Summ. J.

Ex. J, Musoke Dep. at 42-43.).  The thrust of Icleanu's email was that Joyce Rothenberger and

Jarrett had insulted her numerous times and she was fed up with their actions.  (Def.'s Mot.

Summ. J. Ex. D, Icleanu Dep. Ex. 76.)  The only reference to Icleanu's heritage was made by

Icleanu herself when she speculated in the email that she might have been paid less because she

was an immigrant.  (Id.)  Sloan's testimony does not show that Icleanu's national origin played

any role in ABC's decisions.  Moreover, Icleanu was not fired, nor was she given a performance

rating which would put her in jeopardy of being fired.  She was rated as performing satisfactorily

on her 2005 performance review.  (Pl.'s Opp. Ex. P-72.)  A reasonable juror, viewing all this

evidence, could not return a verdict in Icleanu's favor on this issue.  Therefore, ABC's Motion

for Summary Judgment on the Title VII and PHRA retaliation claims must be granted.

### C.    Hostile work environment

Employers violate Title VII when they harass their employees so severely or pervasively

that they alter the conditions of the employee's employment and create an abusive working

16

environment.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).  Title VII states that it
is "an unlawful employment practice . . . to discriminate against any individual with respect to
[the] . . . terms, conditions, or privileges of employment, because of such individual's . . .
national origin[.]" 42 U.S.C. § 2000e-2(a)(1).  Employers are similarly prohibited under the
PHRA.  43 Pa. Cons. Stat. § 955(a).

In order to be actionable, an environment must be both objectively and subjectively
offensive.  Faragher, 524 U.S. at 787.  The "courts [must] determine whether an environment is
sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the
discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interferes with an employee's work
performance."  Id. at 787-88.  "[S]imple teasing, offhand comments, and isolated incidents
(unless extremely serious) will not amount to discriminatory changes in the terms and conditions
of employment."  Id. at 788; Weston, 251 F.3d at 426.

Success on this harassment claim requires that Icleanu prove that (1) she suffered
intentional discrimination because of her national origin; (2) the discrimination was severe or
pervasive; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable
person in like circumstances; and (5) a basis for employer liability exists. Id.; see also Robinson,
120 F.3d at 1300-01; Abramson, 260 F.3d at 276-77.  Viewing all facts and reasonable inferences
in the light most favorable to Icleanu, this Court finds that Icleanu has failed to produce any
evidence showing that the discrimination she was subjected to was severe or pervasive.  The
evidence only shows that one comment was ever made by Joyce Rothenberger and Barbara
Jarrett which referenced immigrants in any manner.  Icleanu needs to show more than this one

17

incident.  While Icleanu has presented evidence showing that these women made other disparaging comments, such as calling her stupid, she has not shown that these comments, which are offensive and unprofessional, were motivated by her national origin.  "Verbal . . . harassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's [national origin]."  Shramban v. Aetna, 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003).  The evidence does not establish that the discrimination Icleanu suffered on account of her national origin was severe or pervasive.  Therefore, ABC is entitled to summary judgment on the claims alleging national origin harassment under 42 U.S.C. § 2000e-2(a)(1) and 43 Pa. Cons. Stat. § 955(a).

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|                                            |   |                |
|--------------------------------------------|---|----------------|
| LUCICA ICLEANU,                            | : | CIVIL ACTION   |
|                                            | : |                |
|      Plaintiff,   | : |                |
|                                            | : |                |
|     v.                  | : | No. 06-2812    |
|                                            | : |                |
| AMERICAN BAPTIST CHURCHES USA,             | : |                |
|                                            | : |                |
|     Defendant.         | : |                |

_____:

## ORDER

     **AND NOW**, this   28th   day of August, 2007, upon consideration of Defendant's

Motion for Summary Judgment (Doc. No. 8) and the Response and Reply thereto, it is hereby

**ORDERED** that the Motion is **GRANTED**.

                                BY THE COURT:


                                /s/ Robert F. Kelly_____
                                ROBERT F. KELLY
                                SENIOR JUDGE